Booth, Judge,
reviewing the facts found to be established, delivered the opinion of the court:
The plaintiff sues to recover alleged excess fees and commissions exacted of him in connection with a public-land entry made under section 2306, Revised Statutes.
The plaintiff, Charles H. Maginnis, was the assignee of Benjamin King, administrator of the estate of James H. Waldron, deceased. Mr. Waldron during his life had been a Union soldier and served more than ninety days in the Army of the United States. He had, prior to June 22,1874, *274 made an original homestead entry for forty acres of land, and on March 25, 1901, the present plaintiff, his assignee as aforesaid, filed his application in the Duluth, Minn., land office for the additional one hundred and twenty acres allowed by section 2306, Revised Statutes. The land-office fees and commissions provided for in the third section of section 2238 and section 2290 of the Revised Statutes were charged and paid by the plaintiff at the time of said application, and it is for a repayment of these identical fees and commissions under the act of March 26, 1908, 35 Stats., 48, that this suit is brought. While the amount is small, the case is of importance, as it involves a substantial number of claimants similarly situated, and directly challenges the rulings of the land office since the enactment of the statute.
A question of jurisdiction under the repayment act of March 26, 1906, supra, first confronts us. The defendants raise the issue predicating their contention upon the theory of a legislation intention apparent from the language of the act of 1908 to grant both the right and remedy exclusively to the Secretary of the Interior. The act of March 26, 1908, is in the following language:
“ Section 1. That where purchase moneys and commissions paid under any public-land law have been or shall hereafter be covered into the Treasury of the United States under any application to make any filing, location, selection, entry, or proof, such purchase moneys and commissions shall be repaid to the person who made such application, entry, or proof, or to his legal representatives, in all cases where such application, entry, or proof has been or shall hereafter be rejected, and neither such applicant nor his legal representatives shall have been guilty of any fraud or attempted fraud in connection with such application.
“ Sec. 2. That in all cases where it shall appear to the satisfaction of the Secretary of the Interior that any person has heretofore or shall hereafter make any payments to the United States under the public-land laws in excess of the amount he was lawfully required to pay under such laws, such excess shall be repaid to such person or to his legal representatives.
“ Sec. 3. That when the Commissioner of the General Land Office shall ascertain the amount of any excess moneys, purchase moneys, or commissions in any case where repayment is authorized by this statute, the Secretary of the Interior shall at once certify such amounts to the Secretary of *275 the Treasury, who is hereby authorized and directed to make repayment or all amounts so certified out of any moneys not otherwise appropriated and issue his warrant in settlement thereof.”
The conclusiveness of the defense necessarily depends upon the ability of the defendants to distinguish this case from the leading case of Medbury v. United States, 173 U. S., 492, followed by this court in a long line of decisions, all of which have been quite recently reviewed by the Chief Justice in Newcomber v. United States, 51 C. Cls., 408.
It is conceded that under the first séction of the statute this court has jurisdiction to enforce repayment of the purchase moneys and commissions mentioned therein, and thereby review the action of the department with refernce thereto. Billings v. United States, 50 C. Cls., 328. The marked and precise difference between section 1 and section 2 of the law is said to be in the use of the words, “m all cases where it shall appear to the satisfaction of the Secretary of the Interior,” such excess shall be repaid, etc.
If by the use of the above language it was intended to lodge in the Secretary of the Interior the exclusive jurisdiction to determine the question of repayment of excessive amounts exacted under the public-land laws, it can not be gainsaid, in view of repeated decisions of the Supreme Court, that this court is without jurisdiction to proceed. While it is difficult to perceive any rational legislative reason for a remedy in this court under section 1 of the law and a positive denial of the same proceeding under section 2 thereof, nevertheless we must look to the statute, for by its provisions the right and remedy are governed.
It is indisputably certain that section two of the statute creates a right to a repayment of any amounts in excess of the legal requirements of the public-land laws, so that we are now alone concerned with the remedy afforded, for, as said by this court in the Newcomber case, supra, “ The underlying principle deducible from the cases is that a claimant entitled to a right by virtue of an act of Congress is also entitled to a .remedy for its enforcement.”
Taking the statute as a whole, its obvious intent is to repay any illegal exaction of fees in connection with entry of *276 public lands, as well as to repay fees legally exacted in cases where certain entries are rejected for causes other than fraud, and the mode of ascertaining the fact is left with the department having jurisdiction of the general subject. While the first section does not expressly designate the official upon whom the duty rests to determine the question of a “ rejection,” nevertheless it is apparent that the Department of the Interior is charged with this duty, and that the issue as to whether a land entry has been “rejected” or “ canceled,” as well as the question of fraud, must be determined to the “satisfaction” of the department before the repayment will be authorized, and the final authority in the department rests in the Secretary of the Interior. The practical operation and effect of the two sections are similar in every respect, although the verbiage is distinct. The second section of the act of June 16, 1880, 21 Stats., 287, says, “ The Secretary of the Interior shall cause to be repaid to the persons who made such entry,” etc., and the Supreme Court in the Medbury case, addressing itself to this law, said:
“ We can not now suppose that Congress intended in such case to make the decision of the Secretary final when it was made on undisputed facts. If not, then there is a remedy in the Court of Claims, for none is given in the act which creates the right. The procedure for obtaining the repayment as provided for in the act must be followed, and when the application is erroneously refused the party wronged has his remedy, but that remedy is not furnished by the same statute which gives him the right.”
The second section of the act of 1880 required an investigation of the facts and the application of the law thereto by the Secretary; his judgment (we may well say his “ satisfaction ”) must be fully appeased before the claimant could avail himself of the provisions of the statute. The act of 1880 was no less mandatory than the act of 1908. Each required a distinct procedure; and when the undisputed facts had been laid before the Secretary nothing remained to be done except a correct application of existing law thereto. The facts determined the legal questions, and if the facts were in accord with the statute, the right granted by the statute vested and repayment must be made. The granted *277 right was the paramount intendment of the law; the procedure for its enforcement was preliminarily lodged in the Secretary of the Interior, and if, as in a case similar to this, claimant is denied the privileges of the grant through the error or failure to act upon the part of the Secretary, he may assert that right by a proper suit in this court under our general jurisdiction. It is a right granted under a law of Congress providing for a detailed and specific procedure which must in the first instance be determined by the Sec-l-etary, but it is none the less a legal right capable of enforcement in this tribunal if upon the facts found the Secretary should have misapplied the statute. Innumerable instances of statutes similar in most respects have been before the court and almost without exception jurisdiction has been taken thereunder and the case heard. Any other conclusion would leave a statutory right granted to a citizen without an adequate and complete relief for its infringement. Mr. Justice Peckham in the Medbury case makes this clear and distinct in the following quotation :
“ If there were any disputed questions of fact before the Secretary, his decision in regard to these matters would probably be conclusive, and would not be reviewed in any court. But where, as in this case, there is no disputed question of fact, and the decision turns exclusively upon the proper construction of the act of Congress, the decision of the Secretary refusing to make the payment is not final, and the Court of Claims has jurisdiction of such a case.”
The act of 1908 creates a special right; it imposes upon the Secretary of the Interior the correct administration of the law, and if he fails in this respect there is a remedy provided in the act of Congress conferring jurisdiction upon this court in clear and definite language in the matter of “ all claims founded upon any law of Congress.”
The decisions of the Supreme Court and this court in reference to the subject matter are set forth in the margin.[1]
*278 An examination of the cases wherein remedial acts and exclusive remedies have been combined in the same statute forcibly emphasize the position that the congressional intention so to do is made free from doubt by the express language of the act and its specific details. In Nichols v. United States, 7 Wall., 122, a case involving the revenue laws of the Government, it was apparent upon the face of the legislation, not only from the express method pointed out to secure a refund of alleged illegal payments of import duties but from the context of the whole body of revenue legislation, that the Congress designed the establishment of a system complete in detail to meet the emergencies of the collection of the Government’s revenues and provide an especial and exclusive method of obtaining redress upon allegations of any illegal exactions. The importance of such a system was fully pointed out by the court, the reasons why this especial governmental function should not be hampered and disturbed by the general demands of claimants was distinctly set forth, and for these reasons a narrow channel of preliminary procedure was provided, compliance with which entitled the claimant to pursue his remedy against a named officer of the Government in the courts of the country. This was obviously exclusive; it was intended to confer this individual right' and provide for its enforcement in this exclusive way.
The act discussed in the Nichols case granted a resort to a Federal court and designated an officer of the Government against whom suit must be brought. Surely it is not to be presumed, in the absence of a definite and certain intention to the contrary, that rights created by an act of Congress are to be exclusively adjudicated and determined by a department other than the judicial branch of the Government. As well said in the Newcomber case, quoting from the Emery case, “ Indeed, the suggestion is plain in the Emery case that the premise ‘that the great act of justice embodied in the jurisdiction of the Court of Claims is to be construed strictly and read with an adverse eye,’ is an inadmissible one.”
On May 20, 1862, 12 Stat. L., 392, Congress passed the original homestead act. The terms and provisions of this law, as well as the intent of Congress in so enacting, are so *279 generally familiar that it need not now be discussed in detail. As to fees and commissions due the registers and receivers of the General Land Office, section 2 of the act provided that after the proper execution of preliminary affidavits and proofs required under the statute the same should be filed with the register or receiver and, upon the payment of ten dollars, the applicant should be permitted to enter the quantity of land specified in the act. Section 6 of the act provided “ that the registers and receivers of the several land offices shall be entitled to receive the same compensation for any lands entered under the provisions of this act that they are now entitled to receive when the same quantity of land is entered with money, one half to be paid by the person making the application at the time of so doing and the other half on the issue of the certificate,” etc.
The third paragraph of section 2238, Revised Statutes, under the general title of “Registers and receivers,” provides as follows:
“ A commission to be paid by the homestead applicant, at the time of entry, of one per centum on the cash price, as fixed by law, of the land applied for; and a like commission when the claim is finally established, and the certificate thereof issued as the basis of a patent.”
The foregoing section is obviously taken from section 6 of the act of May 20, 1862, the original homestead act, and has not subsequently been modified or repealed. It is the law under which at the present time a commission is exacted in cases of homestead entries.
In carrying the original homestead act into the Revised Statutes, section 2 of said act was materially modified in section 2290, the latter section providing as follows:
“ The person applying for the benefit of the preceding section shall, upon application to the register of the land office in which he is about to make such entry, make affidavit before the register or receiver that he is the head of a family, or is twenty-one years or more of age, or has performed service in the Army or Navy of the United States, and that such application is made for his exclusive use and benefit, and that his entry is made for the purpose of actual settlement and cultivation, and not either directly or indirectly for the use or benefit of any other person; and upon filing *280 such affidavit with the register or receiver, on payment of five dollars when the entry is of not more than eighty acres, and on payment of ten dollars when the entry is for more than eighty acres, he shall thereupon be permitted to enter the amount of land specified.”
The provisions of section 2290, Revised Statutes, are at the present time in force and the fees charged and collected in the present case were exacted in pursuance of its terms.
It is elementary that in the absence of a statutory provision providing for the payment and collection of fees in applications for land entries, no charge can be imposed upon the applicant by the administrative officers of the department. As well said in United States v. Shields, 153 U. S., 91, “ fees allowed to public officers are matters of strict law, depending upon the very provisions of the statute. They are not open to equitable construction by the court nor to any discretionary action on the part of the officials.” Keeping in view this wholesome admonition of the law the issue squarely presented in this case resolves exclusively upon the single proposition as to the proper legal classification of the landed estate erected out of the public domain of the Government by section 2306 of the Revised Statutes, commonly known as soldiers’ additional homestead. If said entry is in law a homestead entry and comes within that portion of the homestead law wherein fees and commission are properly chargeable the rulings of the Land Office with respect thereto were legal and proper; if, on the contrary, the estate itself is sm generis unrelated to the homestead laws, it is not subject to the charges laid against it, for which recovery is now sought.
In order to ascertain with preciseness the clear meaning and intent of Congress in the passage of this law it becomes indispensable to review the scope of the legislation affecting the subject matter from its inception.
The first section and the first proviso of section 2 of the act of May 20,1862, provide as follows:
“ That any person who is the head of a family, or who has arrived at the age of twenty-one years, and is a citizen of the United States, or who shall have filed his declaration of intention to become such, as required by the naturalization *281 laws of the United States, and who has never borne arms against the United States Government or given aid and comfort to its enemies, shall, from and after the first of January, eighteen hundred and sixty-three, be entitled to enter one quarter section or a less quantity of unappropriated public lands, upon which said person may have filed a preemption claim, or which may, at the time the application is made, be subject to preemption at one dollar and twenty-five cents, or less, per acre, or eighty acres or less of such unappropriated lands, at two dollars and fifty cents per acre, to be located in a body, in conformity to the legal subdivisions of the public lands, and after the same shall have been surveyed: Provided, That any person owning and residing on land may, under the provisions of this act, enter other land lying contiguous to his or her said land, which shall not, with the land so already owned and occupied, exceed in the aggregate one hundred and sixty acres.
“ * * * Provided, however, That no certificate shall be given or patent issued therefor until the expiration of five years from the date of such entry; and if, at the expiration of such time, or at any time within two years thereafter, the person making such entry; or, if he be dead, his widow; or in case of her death, his heirs or devisee; or in case of a widow making such entry, her heirs or devisee, in case of her death; shall prove by two credible witnesses that he, she, or they have resided upon or cultivated the same for the term of five years immediately succeeding the time of filing the affidavit aforesaid, and shall make affidavit that no part of said land has been alienated, and that he has borne true allegiance to the Government of the United States; then, in such case, he, she, or they, if at that time a citizen of the United States, shall be entitled to a patent, as in other cases provided for by law.”
As before said,it is hardly necessary to comment extensively upon the original homestead law, the act of May 20, 1862. The Congress by the statute was granting a most libera' privilege to the citizens of the United States, a right' to procure by the observation of certain prescribed rules a permanent home out of the public lands of the Government. The estate granted was ample in size and unfettered with the payment of exorbitant fees or commissions. Permanency and settlement were the distinct features of the act; the lands must be personally occupied and cultivated for a period of five years before title became absolute. The grant itself was *282 personal and limited expressly to the applicant, and in the event of his .death subsequent to entry, to his widow and minor children. Kigid provisions circumscribing any attempt t'o divert the express provisions of the law were injected into the statute for the obvious purpose of restraining its scope to the procurement of a permanent homestead. The law itself was enacted at a time when war was flagrant between the United States and the Confederate Government and the loyalty of the applicant was an express condition precedent. The last proviso to section 6 of the act extended the privilege to certain minors who had served in either the Army or Navy of the United States. The fees to be paid, as heretofore observed, were provided for in sections 2 and 6 of the statute.
The act of April 4, 1872, 17 Stat. L., 49, is expressly limited to honorably discharged soldiers and sailors, their widows and orphan children. It is amendatory of the act of May 20, 1862, and the second section thereof provides as follows:
“ That any person entitled under the provisions of the foregoing section to enter a homestead, who may have heretofore entered under the homestead laws a quantity of land less than one hundred and sixty acres, shall be permitted to enter under the provisions of this act so much land as when added to the quantity previously entered shall not exceed one hundred and sixty acres.”
On the 8th of June, 1872, 17 Stat. L., 883, the above section was amended by inserting, after the words “so much land,” the words “ contiguous to the tract embraced in the first entry.” Subsequently, on March 3, 1873, 17 Stat. L., 605, the foregoing amendment was repealed by the passage of the following legislation:
“ That, any person entitled under the provisions of the act relating to soldiers’ and sailors’ homesteads’ approved June eighth, eighteen hundred and seventy-two, be amended so as to read as follows: That any person entitled under the provisions of the foregoing sections to enter a homestead, who may have heretofore entered under the homestead laws a quantity of land less than one hundred and sixty acres shall be permitted to enter so much land as when added to the quantity previously' entered shall not exceed one hundred and sixty acres.”
*283 This, then, was the state of the homestead law as affect's this particular controversy at the time the whole subject matter was carried into the Revised Statutes. The act of March 3, 1873, supra, omitted from previous enactments the requirements as to contiguity and the phrase “ under the provisions of this act,” and as thus worded became section 2306 of the Revised Statutes, as follows.
“Every person entitled under the provisions of section twenty-three hundred and four to' enter a homestead who may have heretofore entered under the homestead laws a quantity of land less than one hundred and sixty acres shall be permitted to enter so much land as, when added to the quantity previously entered, shall not exceed one hundred and sixty acres.”
Prior to the passage of the act of 1873 fees and commissions for soldiers’ additional homesteads were clearly provided for in the act of April 4, 1872. The express language of the act of April 4, 1872, precludes a contrary insistence. It must be conceded that, except for the legislation of March 3, 1873, as subsequently carried into the Revised Statutes as section 2306, the soldier applicant for additional land was to be considered a homestead applicant. What, then, is there in the express provisions of section 2306, R. S., which changes the character of the estate so created so as to warrant a construction that its entry and perfection of title is to be free from charges of fees and commissions as a homestead entry ?
The Supreme Court, in the case of Webster v. Luther, 163 U. S., 331, held that the rights acquired by a soldier or his widow under sections 2306 and 2307 of the Revised Statutes were assignable; that the additional lands granted were bounty lands, free from the requirements of settlement and cultivation. “There was no other purpose but to give it as a sort of compensation for the person’s failure to get the full quota of one hundred and sixty acres by his -first homestead entry.” [Italics ours.] The manifold reasons assigned by the court in reaching its conclusion in no particular ascribe to a soldier’s additional homestead entry a segregated character so distinctive as to make it an independent estate created by and fully provided for in the provisions of section 2306. On the contrary, its existence, as *284 well as the modus operandi of obtaining the grant rest exclusively upon the prior provisions of the homestead law. Eeference must be had to the original enacting part of the homestead law to ascertain the beneficiaries of the statute, the limitations of the estate granted, and all the vital and substantive incidents which in the end make up an unassailable legal title. Section 2306 removed the restrictive limitations placed in the original act in behalf of a limited class of persons, but by so doing did no more than enlarge and modify the original estate granted. The administrative features of the homestead law remained unimpaired; in fact, the court in discussing the case of Webster v. Luther pointedly refers to the prior payment of all lawful fees and commissions, and nowhere intimates an exception in this respect. The original homestead law enacted in the midst of war, as originally framed, tended to embarrass the soldiers absent in the Army in seaming the full benefit of its terms. Numerous provisions subsequently appeared to correct this restriction and enlarge the privileges because of the service rendered by the applicant for the estate to his country. The acts of 1872, the act of 1873, sections 2293 and 2306, Revised Statutes, all attest the intended drift of legislative sentiment toward these particular citizens, but the final result was in the last analysis simply a modification of the basic estate granted by the original homestead act, brought about by the peculiar conditions of the time. All this is pointed out with emphasis in the opinion of the Supreme Court in Webster v. Luther. The homestead laws-embraced these modified changes and, in so far as administrative action is concerned, are not to be considered as independent enactments unrelated to the general subject which gave rise to their passage. They are in pari materia, interdependent, and the general administrative features of the original act apply to the subsequent modifications in the absence of an express provision to the countrary. Section 2306 extended to the soldiers the right to obtain the full quota of lands provided for in the original act; it removed the conditions imposed upon said grant as to settlement and cultivation, but nowhere provided in express terms for the payment of fees and commissions.
*285 The Land Office has consistently followed a construction in harmony with this opinion. Fees and commissions have uniformly been exacted under the homestead laws for soldiers’ additional entries. On November 17, 1911, in an elaborate opinion in response to an application of the claimant herein for a refund of fees, the commissioner reviewed the whole controversy, setting forth the entire course of the office in reference to the matter from its inception. The contemporaneous construction given by the department having jurisdiction of the subject matter of a statute susceptible to ambiguity is entitled to great weight and, as said by the Supreme Court, is not to be overruled “ except for cogent reasons.”
We are of the opinion that where a general law provides in detail for the creation of a privilege and the fees and commissions incident to securing the same, that it is not to be inferred, in the absence of an express intention to the contrary, that a subsequent modification of the basic privilege, which depends for its ascertainment upon the general law, is intended to affect the lawful charges imposed upon the applicant by the prior statute.
It is ordered by the court that the petition in this cause be and the same is dismissed, and judgment is rendered in favor of the United States against the claimant for the cost of printing the record in this cause in the sum of $18.64, to be collected by the clerk as provided by law.-
Hay, Judge, Downey, Judge, Barney, Judge, and Campbell, Chief Jmtice, concur.

 Sampson’s case, 35 C. Cls., 578; Commonwealth Ins. Co. v. United States, 37 C. Cls., 532; Sowle’s case, 38 C. Cls., 525 ; Sanderson’s case, 41 C. Cls., 230; McLean’s case, 45 C. Cls., 95; 226 U. S., 374; Medbury’s case, 173 U. S., 492; Kaufman’s case, 11 C. Cls., 659; 96 U. S., 567; United States v. Savings Bank, 104 U. S., 728; Hvoslef’s case, 237 U. S., 1; United States v. Emery, 237 U. S., 28; Purssell’s case, 46 C. Cls., 509 ; Olin R. Booth’s case, 51 C. Cls., 483; United States ex rel. Parish v. McVeagh, 214 U. S., 124.